IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALVIN VALENZUELA,

       Petitioner,

v.                                     No. CV 10-1127 MCA/GBW

STEVE SILVERSMITH, DEPUTY WARDEN,
McKinley County Detention Center, and
FRANK HECHT, Corrections Administrator,
Tohono O'odham Nation

       Respondents.

<u>AMENDED PROPOSED FINDINGS AND
RECOMMENDATION ON DISPOSITION</u>

THIS MATTER comes before the Court following the hearing of July 13, 2011, and upon the completion of the briefing schedule outlined in the Court's "Order Setting Briefing Schedule." *Doc. 24.* Having now received the parties' briefings, entertained oral argument, and thoroughly examined available case law, the Court renews its recommendation that the Petition for the Writ of Habeas Corpus[1] filed by Petitioner Alvin Valenzuela be dismissed.

<u>PART ONE</u>

I.     FACTUAL BACKGROUND

Petitioner was arrested on July 27, 2007, within the boundaries of the Tohono O'odham Reservation. *Doc. 1*, attach. 3. Thereafter, the Tohono O'odham Nation charged

---

[1]    *Doc. 1.*

Petitioner with eight different violations of the Tribe's Criminal Code. *Id.* Nearly one year later, on June 24, 2008, Petitioner entered into an uncounseled plea agreement with the Tribe and pleaded guilty to one count of Conspiracy, two counts of Aggravated Assault, and one count of Misuse of a Weapon. *Id.* attach. 4. The next day, the Tohono O'odham Judiciary Court sentenced Petitioner, again without the benefit of counsel, to a total term of 1,260 days incarceration. *Id.* at 2, attach. 5. This sentence incorporated individual sentences for the following: (1) Conspiracy - 180 days; (2) Aggravated Assault - 360 days; (3) Aggravated Assault - 360 days; and (4) Misuse of a Weapon - 360 days. *Id.* attach. 4 at 1-2. By the terms of his plea agreement, Petitioner waived his right to appeal the judgment or sentence in the Tohono O'odham Judiciary Court, and subsequently, none was filed. *Id.* at 2.

II.      PROCEDURAL BACKGROUND

Petitioner filed his Petition for the Writ of Habeas Corpus ("Petition") on November 23, 2010. *Doc. 1.* Therein, Petitioner alleges that he is an enrolled member of the Tohono O'odham Nation and that he is being illegally detained at the McKinley County Adult Detention Center in Gallup, New Mexico. *Id.* at 2-3.

Following this filing, I ordered the Respondents named in the Petition to file responses within fourteen (14) days. *Doc. 4.* On December 13, 2010, Steve Silversmith ("Respondent Silversmith"), the Deputy Warden of McKinley County Detention Center, filed his answer to the instant Petition. *Doc. 6.* Although the Petition initially named the

2

Tohono O'odham Nation and Patricia Broken Leg-Brill as additional Respondents, on January 5, 2011, this Court determined that, in addition to Respondent Silversmith, Frank Hecht ("Respondent Hecht"), the Corrections Administrator for the Tohono O'odham Nation, represented the appropriate tribal Respondent to the instant Petition. *Doc. 13.*

On that same day, Respondents Silversmith and Hecht filed a Motion to Dismiss,[2] alleging that Petitioner had failed to exhaust his tribal remedies as required by the doctrine of comity.[3]  Petitioner filed no response, and on January 27, 2011, Respondents filed a "Notice of Briefing Complete" regarding their Motion to Dismiss. *Doc. 17.*

A.      Proposed Findings of Fact and Recommended Disposition

After considering the Motion to Dismiss, I filed my Proposed Findings of Fact and Recommended Disposition ("PFRD") concerning the Petition on February 16, 2010. *Doc. 18.* The PFRD detailed that Petitioner had neither exhausted his tribal remedies nor shown how he fit within one of the narrow exceptions to the rule of tribal exhaustion. *Id.* at 4-5. Ultimately, I found "no basis to excuse [Petitioner's] failure to present his claim to the tribal court. *Id.* at 5.  Therefore, I recommended to United States District Judge M. Christina Armijo that the Petition be dismissed without prejudice for failure to exhaust tribal remedies. *Id.* at 4-5

---

[2]        *Doc. 15.*

[3]        In addition to joining in the Motion to Dismiss, Respondent Hecht also filed a separate Answer to the Petition on January 10, 2011. *Doc. 16.*

B.      Petitioner's Objections

On March 3, 2011, Petitioner filed objections to the PFRD.  *Doc. 20.*  In sum, he attacks the PFRD on five grounds.  First, Petitioner contends that no statutory requirement of exhaustion of tribal remedies exists in his case.  *Id.* at 2-3.  Second, he argues that the absence of counsel effectively deprived him of what tribal remedies did exist.  *Id.* at 3-4. Third, he states that he was not required to seek "discretionary review" by the Tribe.  *Id.* at 4.  Fourth, he posits that tribal court exhaustion would be futile.  *Id.* at 5-6.  Finally, Petitioner avers that the sentencing issues in his case "are dispositive," and moreover, that they mandate the immediate grant of relief.  *Id.* at 6.

C.      Petitioner's Release

By late March 2011, this Court had reason to believe, based upon the time line in Petitioner's case, that he might have been released from custody.  As a consequence, on March 29, 2011, I ordered counsel for all parties to appear for a telephonic status conference on April 5, 2011.  *Doc. 21.*  In the order, the parties were placed on notice that they should "be prepared to discuss the status of Petitioner's confinement."  *Doc. 21.*

Just two days after this Order's issuance, Respondent Hecht filed his "Notice of Release."  *Doc. 22.*  By that filing, Respondent Hecht communicated that Petitioner had been released on March, 11, 2011.  *Id.*  To substantiate the fact, he incorporated, as an exhibit, an internal Tohono O'odham Nation Police Department printout stating that Petitioner was to be released on March 11, 2011.  *Id.* at Ex. A.

4

D.      The Parties' Positions on Mootness

On April 5, 2011, the parties appeared before me telephonically. *Doc. 23.* At that status conference, I directed all parties to proffer argument on the effect that Petitioner's release might bear upon the mootness of his case. *Id.* at 1. When asked for her position, Petitioner's counsel argued that the case remained justiciable as to both Respondent Hecht and Respondent Silversmith. *Id.* at 1-2. Respondent Hecht, however, posited that the case had become moot. *Id.* at 1. Recognizing that none of the parties had been given the opportunity to brief the issue of mootness, I informed the parties that an order would issue setting a briefing schedule. *Id.* at 2.

That same day, this Court ordered Petitioner to file a brief articulating his position on the issue of mootness within thirty (30) days. *Doc. 24.* Similarly, both Respondents Hecht and Silversmith were afforded thirty (30) days from the time of that filing to respond. *Doc. 24.* Rather than postpone his opportunity to address Respondents' arguments until after the filing of the instant PFRD, I allowed Petitioner to file a Reply to Respondents' filings. *Doc. 31.* By June 24, 2011, the parties had completed briefing. Following an examination of Petitioner's objections to the PFRD, the issue of mootness will be explored in detail.

III.    RELEVANT LAW CONCERNING TRIBAL HABEAS PETITIONS

The Indian Civil Rights Act ("ICRA") authorizes the filing of petitions for the writ of habeas corpus by any person detained to test "the legality of his detention by order of

an Indian tribe." 25 U.S.C. § 1303 (2006). Nevertheless, prior to filing such a suit, a

petitioner is required to exhaust his or her remedies in tribal court. The tribal exhaustion

rule is a judicially created rule, and an outgrowth of the federal government's longstanding

policy of encouraging tribal self-government. *National Farmers Union Ins. Cos. v. Crow Tribe

of Indians*, 471 U.S. 845, 856 (1985); *see also Iowa Mut. Insur. Co. v. LaPlante*, 480 U.S. 9, 14

(1987); *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1378 (10th Cir. 1993) (noting that "[w]hen the activity

at issue arises on the reservation, [federal] polic[y] almost always dictate[s] that the parties

exhaust their tribal remedies before resorting to a federal forum"). "Tribal courts play a

vital role in tribal self-government, and respect for that role requires, as a matter of *comity*,

that examination of issues of tribal sovereignty and jurisdiction be conducted in the first

instance by the tribal court itself." *Reservation Tel. Co-op. v. Affiliated Tribes*, 76 F.3d 181, 184

(8th Cir. 1996) (emphasis added).

The Supreme Court has recognized exceptions to the requirement of exhaustion of

tribal remedies, namely, where the assertion of tribal jurisdiction is motivated by a desire

to harass or is conducted in bad faith; where the tribe's exercise of authority is patently

violative of express jurisdictional prohibitions; or where exhaustion would be futile because

of the lack of an adequate opportunity to challenge the tribal court's jurisdiction. *National

Farmers*, 471 U.S. at 857 n.21; *see also Burrell v. Armijo*, 456 F.3d 1159, 1168 (10th Cir. 2006).

Allegations of local bias and tribal court incompetence, however, are not exceptions to the

exhaustion requirement. *Iowa Mut.*, 480 U.S. at 19.

With respect to the "violative of express jurisdictional prohibitions" exception, it has typically been considered in the context of tribes attempting to adjudicate matters involving non-Indians. *See Iowa Mut. Insur. Co. v. LaPlante*, 480 U.S. at 19, n.12; *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1502 (10th Cir. 1997). To establish that the tribe's exercise of authority is patently violative of express jurisdictional prohibitions, the Supreme Court requires "a substantial showing." *Kerr-McGee Corp*, 115 F.3d at 1502. Further, tribal courts rarely lose the first opportunity to determine jurisdiction because of an express jurisdictional prohibition. *Id.* (internal quotation marks omitted).

With respect to the "futility" exception, the Tenth Circuit has narrowly construed it. For example, in *Texaco*, the plaintiff brought an action seeking a declaration that the Navajo Nation lacked authority to assess taxes on activities occurring outside the Navajo Reservation. *Texaco*, 5 F.3d at 1375. The plaintiff failed to first make that argument in the tribal court but argued that he should be excused under the "futility" exception. *Id.* at 1377. Plaintiff contended that "they lack[ed] an adequate opportunity to challenge the tribal court's jurisdiction because the Navajo tribal courts already ha[d] determined that they ha[d] jurisdiction over non-Indian activities occurring outside the reservation but within Navajo Indian Country." *Id.* The Court rejected this circumstance as falling within the "futility" exception explaining:

> Even if true, however, this argument misses the mark. While the Navajo Tribal Code expressly grants the Navajo tribal courts jurisdiction over challenges to the validity of the Navajo tax code, *see* Navajo Trib. Code tit. 24,

7

§ 434(d) (1986), the tribal courts continue to have authority to dismiss a case for lack of jurisdiction. *See, e.g., Sandoval v. Tinian, Inc.*, 5 Navajo Rptr. 215, 217 (Navajo D.Ct.1986) (considering existence and propriety of tribal jurisdiction). Therefore, appellants will have an adequate opportunity to challenge the tribal court's jurisdiction.

*Id.* It is apparent from *Texaco* that the "futility" exception requires more than an unlikeliness of success.

## IV.   ANALYSIS OF PETITIONER'S OBJECTIONS TO THE PFRD

As mentioned above, Petitioner contests the recommendations of the PFRD on five separate grounds. The deficiencies of these arguments will be discussed *seriatim*.

### A.   Comity Requires Exhaustion of Petitioner's Tribal Remedies

As a threshold matter, Petitioner avers that "no statutory exhaustion requirement . . . applies to the specialized privilege of a Petition for a Writ of Habeas Corpus filed by an Indian prisoner pursuant to 25 U.S.C. § 1303." *Doc. 20* at 2. Additionally, he contends that "even if applicable, exhaustion of tribal remedies is not an inflexible requirement." *Id.* (internal quotation marks and citations omitted). Finally, Petitioner posits that "because of the factual and procedural history of this case, this Court is [Petitioner's] only opportunity to review his illegal sentence and detention." *Id.* at 3. By his estimation, "[w]ithout immediate federal court review and grant of relief to which he is entitled, [Petitioner] suffers irreparable damage." *Id.*

Despite Petitioner's Objections, this Court remains convinced that comity requires the exhaustion of tribal remedies. Fundamentally, the tribal exhaustion rule derives from

Congress's "strong interest in promoting tribal sovereignty, including the development of tribal courts." *Smith v. Moffett*, 947 F.2d 442, 444 (10th Cir. 1991). Congress, however, did not establish the tribal exhaustion rule through ICRA. *See doc. 20* at 2; *see also* 25 U.S.C. § 1303. Rather, the tribal exhaustion rule has been created by the federal judiciary, and as it is interpreted by the Tenth Circuit, "provides that absent exceptional circumstances, federal courts typically 'should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted.'" *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1149 (10th Cir. 2011) (quoting *Bank of Okla. v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1170 (10th Cir. 1992)) (additional citations omitted). In short, the Tenth Circuit has applied a less flexible approach to the tribal exhaustion rule than the courts to which Petitioner cites. *See e.g.*, *United States v. Cobell*, 503 F.2d 790, 793 (9th Cir. 1974); *see Doc. 20* at 2.

In the instant case, Petitioner has demonstrated no exceptional circumstance substantiating the abandonment of the tribal exhaustion rule. Despite arguing that the federal courts provide his only avenue for habeas review, Petitioner has never effectively accounted for his failure to pursue the habeas procedures provided by the Tohono O'odham Nation. *See doc. 18* at 5, attachs. 1, 2. Furthermore, what justifications he has advanced[4] fail to qualify as recognized exceptions to the exhaustion requirement. Finally,

---

[4]   Petitioner claims that both lack of counsel and futility prohibited him from exercising the tribal remedies available under Tohono O'odham law. These arguments are addressed in Sections IV(B) & (C), *infra.*

Petitioner's contention that immediate federal court review is necessary to prevent irreparable damage has been obviated by his release and the mootness of his case, as will be discussed *infra*. For these reasons, I recommend that this objection to the PFRD be overruled.

      B.      Absence of Counsel Did Not Deprive Petitioner of Tribal Remedies so as to Excuse Failure of Exhaustion

Next, Petitioner objects to the PFRD on the grounds that "[h]e had no tribal remedies." *Doc. 20* at 3. According to Petitioner, because he was "imprisoned at all times since his arrest on July 27, 2007," and moreover, because he "entered into an uncounseled plea agreement at the tribal court level . . . a tribal petition for habeas relief was not an available option." *Id.* He supports this argument by claiming "the lack of defense counsel prevented tribal habeas relief," and in a similar vein, that "lack of knowledge or access to tribal codes prevented any post-conviction remedy." *Id.* at 3-4.

I recommend that this objection be overruled for two reasons. First, at the time of Petitioner's conviction, ICRA did not allow for the assignment of tribally-funded counsel. *See* 25 U.S.C. § 1302(6) (2006) (guaranteeing a tribal defendant "at his own expense to have the assistance of counsel"), *amended by* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2281 (codified as amended at 25 U.S.C. § 1302) (requiring tribes, when imposing a total sentence of more than one year, "at the expense of the tribal government, [to] provide an indigent defendant the assistance of a defense attorney licensed to practice

law by any jurisdiction in the United States . . . "). Instead, at the time of Petitioner's conviction, ICRA only guaranteed tribal defendants the right to retain counsel at their own expense. Nowhere in the pleadings has Petitioner argued that he asserted his right to retain counsel and the Tribe denied the same. As a consequence, Petitioner's lack of counsel does not present an "exceptional" circumstance substantiating deviation from the tribal exhaustion rule, but rather, the general circumstance of a tribal defendant convicted before a tribal court in 2008.

Second, Petitioner's argument that lack of counsel and access to tribal law prevented the filing of a tribal petition cannot be reconciled with the fact of the instant filing. Even assuming, *arguendo*, that ignorance of these procedures justified *Petitioner's* failure to exhaust tribal remedies, this Court cannot comprehend how that same justification could be extended to Petitioner's *counsel*, as at the time the instant Petition was filed in federal court, it was done with the benefit of counsel. That same counsel, who is held professionally responsible for knowledge of law in those fields in which she chooses to practice, should have been aware of the Tohono Oodham Nation's habeas procedures and exhausted them in accordance with the tribal exhaustion rule. Nonetheless, Petitioner, through his counsel, did not do so, but filed immediately in this forum.[5] Because Petitioner possessed that benefit of counsel, and because said counsel

---

[5]     Petitioner's Objections do not frame this argument as an attempt to fit within the "futility" exception. However, even if framed as such, it would fail because he has not demonstrated that filing a habeas petition in tribal court would have been

failed to exhaust tribal remedies, I recommend that this objection also be overruled.[6]

        C.      Tribal Habeas Filings Are Not Discretionary For Purposes of Exhaustion

        Additionally, Petitioner claims that "[t]he post conviction remedy alleged by the Tribe and adopted by the Magistrate Judge as the available tribal court remedy is not required under the Tribe's own laws and procedure." *Doc. 20* at 4.  As understood by Petitioner, "the plain language of the Tohono O'odham Code specifically provides for discretionary review only." *Id.*  Indeed, from the language "[a] party may file with the lower court a petition for the writ of habeas corpus which shall be forwarded to the court of appeals,"[7] Petitioner concludes that he "was not required to file a petition under the Tribe's own rules." *Id.*  Rather, Petitioner claims "[a] petition would not be warranted in this case[,] especially because there was no court of appeals decision from which to seek relief." *Id.*

        This objection appears to be without merit, and I recommend it be overruled. Under the Tohono O'odham Court Rules of Appellate Procedure, prisoners possess two avenues for post-conviction review of their sentences.  The first of these is that of direct appeal, which appears in Rule 12.  TOHONO O'ODHAM CT. R. APP. P. 12 (2003).  The second

---

patently futile.  *See Texaco*, 5 F.3d at 1377 (futility exception requires more than an unlikeliness of success).

    [6]      Relatedly, assuming this argument is designed to fit into the futility exception to the exhaustion requirement, it cannot meet theat standard.

    [7]      TOHONO O'ODHAM CT. R. APP. P. 24(a).

of these is the right to petition for the writ of habeas corpus, which can be found at Rule 24(a). TOHONO O'ODHAM CT. R. APP. P. 24(a) (2003). As a product of the plea agreement he entered into, Petitioner waived his right to direct appeal of his sentence. *See doc. 1*, attach. 4. Hence, Petitioner's exclusive tribal remedy became that of habeas review under Rule 12.

Clearly, habeas review at the tribal level is elective where no subsequent review is intended. As recounted by Petitioner, the Rule allows that "[a] party may file with the lower court a petition for a writ of habeas corpus." *Doc. 20* at 4; TOHONO O'ODHAM CT. R. APP. P. 24(a). This evinces the same availability of right contained in 25 U.S.C. § 1303, which provides that "[t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303. Neither section commands a prisoner to file for habeas review, but rather, each enshrines the prisoner's ability to do so.

The tribal exhaustion rule, on the other hand, is not permissive. Indeed, the Tenth Circuit holds that "[w]hen the activity at issue arises on the reservation, [federal] polic[y] almost always dictate[s] that the parties exhaust their tribal remedies before resorting to a federal forum." *Texaco,* 5 F.3d at 1378. So, while Petitioner may have elected to either file or abstain from filing a habeas petition with the Tohono O'odham Nation as a matter of tribal right, when his intent progressed to seeking federal review of his tribal claim, the tribal exhaustion rule acted to transform what had been a permissive claim into a

compulsory one.   Put another way, the Tohono O'odham Nation may not require

prisoners to file a tribal habeas petition,[8] but where federal review of that sentence is

sought, the federal courts do.   Petitioner elected not to exhaust his tribal remedies by

petitioning for the writ of habeas corpus before the Tohono O'odham Nation, and as a

result, I believe federal review of his Petition is barred by the tribal exhaustion rule.

Accordingly, I recommend that this objection be overruled.

> D.   Petitioner Has Not Established that Pursuit of Tribal Remedies Would
> Not Have Been Futile so as to Excuse Failure of Exhaustion

As grounds for his fourth objection, Petitioner claims, "[i]n this case, the tribal

remedy was not option." *Doc. 20* at 5.   He explains that "[b]y the time he entered the plea

agreement," he "had already served eleven months in prison, and the Tribe's one-year

sentencing jurisdiction under 25 U.S.C. [§] 1302(7) was already due to expire."   *Id.*   Thus,

by Petitioner's account, "even if a tribal habeas petition was an available remedy,

[Petitioner] was close to serving the maximum term allowable."   *Id.*   Based upon this

sequence of events, Petitioner reasons that "[h]is sole remedy to correct the sentence in

excess of the statutory maximum remains with this Court."   *Id.*   In fact, he opines that

---

[8]      In fact, this Court can think of no circumstance where a jurisdiction
requires a prisoner to file a habeas petition. *See e.g.* N.M.S.A. § 44-1-1 ("Every person
imprisoned or otherwise restrained of his liberty . . . may prosecute a writ of habeas
corpus, . . . to obtain relief from such imprisonment.") (emphasis added).   Nonetheless,
an individual is typically required to exhaust those discretionary avenues before
moving to a federal court.   *See* 28 U.S.C. § 2255.   Similarly, a prisoner is never required
to file a direct appeal, although failing to do so will often lead to the waiver of issues
which could have been so raised.

"[r]equiring him to return to tribal court at this time is futile and would cause irreperable

damage because he has already served too much time . . . ." *Id.*

I recommend this objection be overruled.  Although exceptions to comity and the

tribal exhaustion rule exist, they are narrow and few.  *See National Farmers*, 471 U.S. at 857

n.21.  One recognized exception occurs "where exhaustion would be futile because of the

lack of an adequate opportunity to challenge the tribal court's jurisdiction."  *Kerr-McGee*

*Corp. v. Farley*, 115 F.3d 1498, 1501 (10th Cir. 1997) (quoting *National Farmers*, 471 U.S. at

857 n.21); *see Enlow v. Moore*, 134 F.3d 993, 995 (10th Cir. 1998).  Although not framed in

these precise terms, Petitioner's objection can most easily be understood as an objection

to the tribal exhaustion rule under this "futility of tribal remedies" exception.

Considering Petitioner's objection within this construct, I can find no evidence to

support his assertion that tribal remedies would have proven futile.  Petitioner's primary

argument – that "even if a tribal habeas petition was an available remedy, [Petitioner] was

close to serving the maximum term allowable" – fall far short of showing futility.  *See Doc.*

*20* at 5.  The logical extension of this argument would mean that a prisoner could argue

that his direct appeal is futile because he may not receive a ruling prior to the expiration

of his sentence.  Such a concept of futility should be rejected.  Next, Petitioner posits that

"[r]equiring him to return to tribal court at this time is futile and would cause irreparable

damage because he has already served too much time, and his illegal sentence will

expire."  *Id.*  This argument for futility, however, is based not on some failing of the tribal

court but on Petitioner's own delay in going back to that court.  Certainly, an individual's

own delay cannot be an "exceptional circumstance" excusing the exhaustion requirement.

*See Stidham*, 640 F.3d at 1149.  Absent any other evidence of futility, I must recommend this

objection be overruled.  *See White v. Pueblo of San Juan*, 728 F.2d 1307, 1313 (10th Cir. 1984)

("speculative futility is not enough to justify federal jurisdiction").

     E.     Petitioner Has Not Established the "Violative of Express Jurisdictional Prohibitions" Exception so as to Excuse Failure of Exhaustion

Lastly, Petitioner objects to the PFRD on the grounds that "[t]he illegal sentence

claim is dispositive and [Petitioner] is entitled to relief on that claim alone as it appears in

the record." *Doc. 20* at 6 (citations omitted).  According to Petitioner, "[a]ny further delay

would cause irreparable harm to [Petitioner] and emergency review and immediate relief

is required." *Id.*

I recommend this objection be overruled on two grounds.  First, to the extent that

it is relevant to the issue of exhaustion, whatever immediate need for relief existed at the

time of Petitioner's objections has been obviated by his release. *See doc. 22.*  Second, even

if Petitioner had not been released resulting in the mootness of his case,[9] Petitioner fails

to establish that the nature of his claim dictates that the tribal exhaustion rule should be

discarded in this action.

Though not framed in the precise terms of the "violative of express jurisdictional

_____

[9]    *See infra*, section V.

prohibitions" exception, this argument appears to be aimed at that exception to the exhaustion requirement.  However, the illegality of Petitioner's sentence is by no means clear.  *See infra* pp. 41-47.  In fact, as discussed below, a recent Ninth Circuit opinion has held that sentences above a year are authorized under ICRA as long as the sentence is reached by imposing consecutive misdemeanor sentences.  *See Miranda v. Anchondo*, Nos. 10-15167, 10-15308, 2011 WL 3607130 (9th Cir. Aug. 17, 2011).  To fit within this exception, the tribal court's action must be "*patently* violative of an *express* jurisdictional prohibition.*" Texaco,* 5 F.3d at 1377-78 (emphasis in original).  Given the unsettled nature of the law underpinning Petitioner's claim, he cannot meet this demanding standard.

In fact, two of the cases cited by Petitioner[10] undermine his argument on this point. *See Pacheco v. Massingill*, No. 1:10-cv-00923-RB-WDS (D.N.M. Oct. 27, 2010); *Calabaza v. Massingill*, No. 1:10-cv-01207-JCH-WDS (D.N.M. Feb. 3, 2011).  In *Pacheco*, U.S. District Judge Brack did find a petitioner entitled to "immediate relief" under 25 U.S.C. § 1303. *Pacheco,* slip op. (Doc. 10) at 2 (D.N.M. Oct. 27, 2010).  Moreover, District Judge Brack ordered the release of the petitioner in *Pacheco* following "a prima facie showing that the Tribal Court imposed a sentence in excess of the statutory maximum under the Indian Civil Rights Act, 25 U.S.C. § 1302(7)."  *Id.*  In *Pacheco*, Judge Brack found that "[a]ll attempts by Petitioner's counsel to meet and confer with officials of the Kewa Tribal Court

---

[10]    The only other case from this jurisdiction cited by Petitioner on this point also does not assist him because the Court did not find an ICRA violation in that case. *See Romero v. Goodrich*, No. 1:09-cv-00232-RB-DJS (D.N.M. July 7, 2011).

ha[d] been denied by tribal officials." *Id.* at 1.  In fact, that petitioner's counsel "attempted to file an Entry of Appearance and a Motion to Reconsider Sentence with the Kewa Pueblo Tribal Court. The entry of appearance was denied by Wilson Quintana, a Kewa Tribal Court Clerk." *Pacheco, Doc. 1* at 4.  Consequently, Judge Brack held that "Petitioner ha[d] exhausted all appropriate tribal remedies and that []his petition [was] properly before th[e] Court." *Id.*  Notably, Judge Brack did not proceed to the merits of the case until making this finding.  *Id.*[11]

Following the *Pacheco* case, U.S. District Judge Judith C. Herrera also found a petitioner entitled to "immediate relief" under 25 U.S.C. § 1303.  *Calabaza v. Massingill*, No. 1:10-cv-01207-JCH-WDS, slip op. at 2 (D.N.M. Feb. 3, 2011).  Just as Judge Brack had in *Pacheco*, Judge Herrera concluded that "the Tribal Court imposed a sentence in excess of the statutory maximum under the Indian Civil Rights Act, 25 U.S.C. § 1302(7)."  *Id.*[12] Again though, Judge Herrera also observed that "Petitioner has exhausted all apparent tribal remedies," and as such, found his petition "properly before the Court."  *Id.* at 3. Only after announcing that finding did she find "that Petitioner ha[d] made a prima facie

---

[11]     *Pacheco* is also distinguishable from the instant case because, while Judge Brack did make a finding that petitioner was entitled to immediate relief, the Court had previously been advised that the tribe had "no intention of responding to the Petition for Habeas Corpus." *Pacheco, Doc. 9.*  Consequently, the *Pacheco* ruling was in the nature of a default judgment.  In the instant case, the tribe has vigorously defended the case.

[12]     Just like in *Pacheco,* the tribe in *Calabaza* refused to respond to the Petition. *Calabaza, Doc. 7.*  Consequently, the *Calabaza* ruling was in the nature of a default judgment.

showing that the Tribal Court imposed a sentence in excess of the statutory maximum."
*Id.*

*Pacheco* and *Calabaza* implicitly stand for the proposition that, even where the court concludes on the pleadings that an illegal sentence has been imposed, the "violative of express jurisdictional prohibitions" exception does not excuse a failure of exhaustion. Combining that reasoning with the recent *Miranda* decision from the Ninth Circuit which, if accepted here, would completely defeat Petitioner's sentencing claim, I conclude that he cannot use this exception to excuse his failure to exhaust tribal remedies. Accordingly, I recommend that this objection be overruled.

PART TWO

V.     MOOTNESS OF THE INSTANT PETITION

In the interests of a comprehensive Amended PFRD, I have addressed each of Petitioner's objections to the original PFRD. Nonetheless, the dispositive issue before the Court is whether Petitioner's release from custody has rendered his Petition moot. Based on extant case law, the facts of this case, and the arguments of the parties, I believe the instant Petition has been rendered moot by Petitioner's release.

To examine the issue of mootness, Part Two of this Amended PFRD will be divided into five distinct sections. First, this Amended PFRD will provide an overview of the law of mootness as it relates to released prisoners. Second, the Amended PFRD will demonstrate how the instant Petition is moot as to Respondent Silversmith. Third, the

19

Amended PFRD will explain the maximum relief the Court could conceivably recommend based on an assessment of Petitioner's claims, and the related inability of such relief to affect Petitioner's collateral consequences.  Fourth, the Court will explore how, even if Petitioner were able to surmount the deficiencies of his claims and prevail completely on his Petition, the relief available under Tenth Circuit case law would have no effect on the collateral consequences of his convictions.  Finally, this Amended PFRD will detail how, even if the Court could grant all the relief requested by Petitioner, the collateral consequences of four misdemeanor convictions are insufficient to give him a substantial stake in the outcome of the case.  This discussion begins below.

>    A.      Mootness and its Application in the Habeas Context

Before a court addresses the merits of a post-conviction appeal or habeas action, it must first determine whether in fact it has jurisdiction over that action.  *See United States v. Meyers*, 200 F.3d 715, 718 (10th Cir. 2000).  Article III of the United States Constitution only extends federal judicial power to cases or controversies.  U.S. CONST. art. III, § 2, cl. 1.  In order to satisfy the case or controversy requirement, a litigant must "continue to have a personal stake in the outcome" of his case.  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quotation omitted).  To do so in the habeas context, "[t]he federal habeas corpus statute requires that [a prisoner] must be 'in custody' when the application for habeas corpus is

filed." *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968).[13]  More particularly, the Supreme Court has interpreted this "in custody" language "as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed." *Maleng v. Cook*, 490 U.S. 488, 490 (1988) (per curiam) (citation omitted).  Once the prisoner's sentence has expired, however, "some concrete and continuing injury other than the now-ended incarceration or parole - some 'collateral consequence' of the conviction - must exist if the suit is to be maintained." *Spencer*, 523 U.S. at 7 (citing *Carafas*, 391 U.S. at 237-38).

       This rule, known as the collateral consequences doctrine, recognizes that the law naturally imposes future indirect consequences when a previous judgment, conviction, or sentence affects a prisoner's civil liberties following release.  *Sibron v. New York*, 392 U.S. 40, 55 (1968); *see also Carafas*, 391 U.S. at 237.  Such consequences include, among others, legal ineligibility to serve on a jury, vote, hold office or operate certain businesses.  *Spencer*, 523 U.S. at 8.  At the inception of this doctrine, the Supreme Court held that the "mere possibility" of an adverse legal collateral consequence was "enough to preserve a criminal

---

       [13]       Section 1303 of the ICRA provides: "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."  25 U.S.C. § 1303.  "The term 'detention' in the statute must be interpreted similarly to the 'in custody' requirement in other habeas contexts."  *Jeffredo v. Macarro*, 599 F.3d 913, 918 (9th Cir. 2010) (*citing Moore v. Nelson*, 270 F.3d 789, 791 (9th Cir. 2001) ("There is no reason to conclude that the requirement of 'detention' set forth in the Indian Civil Rights Act § 1303 is any more lenient than the requirement of 'custody' set forth in the other habeas statutes.")).

case from ending ignominiously in the limbo of mootness." *Sibron*, 392 U.S. at 56 (citation omitted).  "Thereafter, and in summary fashion, [the Supreme Court] proceeded to accept the most generalized and hypothetical of consequences as sufficient to avoid mootness in challenges to conviction." *Spencer*, 523 U.S. at 10.  In fact, in *Evitts v. Lucey*, the Supreme Court held that a petitioner's habeas challenge had not become moot despite the expiration of his sentence and despite the fact that "his civil rights, including suffrage and the right to hold public office, [had been] restored." *Evitts v. Lucey*, 469 U.S. 387, 391 n.4 (1985).  At that time, since the petitioner had yet to be pardoned, the Court held, "some collateral consequences of his conviction remain, including the possibility that the conviction would be used to impeach testimony he might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future." *Id.*  Near in time to the *Evitts* decision, however, the Supreme Court began the steady narrowing of the collateral consequences rule.

The circumscription of the collateral consequences doctrine began in 1982 and has progressed gradually ever since.  The first instance occurred in the *Lane* case, where the Supreme Court refused to extend the presumption of collateral consequences to the revocation of parole.  *Lane v. Williams*, 455 U.S. 624, 632 (1982).  In 1998, the Supreme Court went on to acknowledge "that the practice of presuming collateral consequences (or of accepting the remote possibility of collateral consequences as adequate to satisfy Article

III) sits uncomfortably beside the long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record, and that it is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer*, 523 U.S. at 10-11 (internal quotation marks and citation omitted). Building upon this rationale, the Court affirmed the holding in *Lane* and "decline[d] to presume that collateral consequences adequate to meet Article III's injury-in-fact requirement result[] from [] parole revocation." *Id.* at 14.

More importantly, in the *Spencer* decision, the Supreme Court curtailed the increasingly speculative boundaries of the collateral consequences rule. As one panel of the Tenth Circuit declared, "*Spencer* is the pivotal case because of the Supreme Court's pronounced retreat from earlier cases which had simply presumed the existence of collateral consequences." *Wilcox v. Aleman*, 43 F. App'x 210, 212 n.1 (10th Cir. 2002) Rather than a blanket presumption of collateral consequences, "the Supreme Court held that once a sentence has expired, a habeas petitioner must show a *concrete and continuing injury*, i.e., a collateral consequence of the conviction, in order to continue his action." *Wilcox v. Aleman*, 43 F. App'x 210,  211-12 (10th Cir. 2002) (citing *Spencer*, 523 U.S. at 7-8) (emphasis added). Following *Spencer*, "[n]o longer are collateral consequences (other than those attached to the conviction itself) presumed; instead, the petitioner has the burden of demonstrating the existence of sufficient collateral consequences to save the action from

the mootness death knell." *Id.* at 212 (citing *Spencer*, 523 U.S. 10-11)); *see also Fratis v. Ortiz,* 190 F. App'x 686, 688 (10th Cir. 2006) (detailing the Supreme Court's holding that collateral consequences must be proved, not presumed).

Building on *Spencer*, the Tenth Circuit declined to extend the presumption of collateral consequences to supervised release, stating, "when a defendant appeals the revocation of his supervised release and resulting imprisonment and has completed that term of imprisonment, the potential impact of the revocation order and sentence on possible later sentencing proceedings does not constitute a sufficient collateral consequence to defeat mootness." *Meyers,* 200 F.3d at 722. In *Meyers*, the Tenth Circuit also "recognized that under *Spencer* collateral consequences cannot be based on the speculation that an individual will receive an enhanced sentence in future sentencing proceedings in connection with a crime he has not yet committed." *United States v. Hernandez-Baide*, 146 F. App'x 302, 304 (10th Cir. 2005) (citing *Meyers*, 200 F.3d at 719). Finally, in those instances where the collateral attack does not aim at the conviction itself, the *Meyers* court held that the prisoner "bears the burden of demonstrating the existence of sufficient collateral consequences to save the action from mootness." *Id.* (citing *Meyers*, 200 F.3d at 722).

B.    The Instant Petition is Moot as to Respondent Silversmith

1.    Petitioner's position

To support the perpetuation of Respondent Silversmith's participation in this suit,

Petitioner refers to him as "an indispensable party." *Doc. 26* at 11. Petitioner explains that once "'federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application.'" *Doc. 32* at 4 (quoting *Carafas*, 391 U.S. at 238). Further, he posits that "there is a live case and controversy," because "the individual who has immediate custody of the inmate-Petitioner at the time of filing is a proper respondent to a [h]abeas petition." *Id.* at 4-5 (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434-36 (2004)). Therefore, because Respondent Silversmith was the immediate custodian of Petitioner at time of suit, Petitioner argues that he remains a proper party so long as the case is not moot and fully justiciable. *See id.* at 5.

In addition, Petitioner alleges a public-policy interest in declaring the invalidity of his custody under Respondent Silversmith's supervision. *Id.* at 8. According to Petitioner, "[j]udicial review of [Petitioner's] meritorious claims encompasses even greater interests of justice than whether Respondent Silversmith [as warden] can still turn a key to release [Petitioner] from custody." *Id.* at 9. Indeed, Petitioner concludes that "[t]he fact that the warden can no longer turn the key does not let him off the hook or render the case without a remedy as to any party." *Id.* Rather, Petitioner believes this Court may yet formulate a remedy directed at either the Tribe or the Warden. *Id.*

2.     Respondent Silversmith's reply

In reply, Respondent Silversmith contends that the instant Petition "is entirely moot

as to [Respondent Silversmith]," and that he "should be dismissed from this action." *Doc. 27* at 2. Primarily, Respondent Silvermith argues that the relief sought by Petitioner cannot be redressed through a writ of habeas corpus directed at him. *Id.* at 3. That relief includes: (1) finding that Petitioner's conviction is in violation of the ICRA, and vacating the wrongful conviction; (2) finding the 1260-day sentence illegal and in violation of ICRA, and vacating the sentence; and (3) commanding Respondents to immediately release Petitioner. *Doc. 1* at 5. From these bases of relief, Respondent Silversmith concludes that "[a]part from the Tribal Court - which accepted Petitioner's plea agreement, then convicted and sentenced him - the only proper party-respondent to a writ of habeas corpus is a person with the ability to produce Petitioner's body." *Id.* (citing *Ga!aviz-Medina v. Wooten,* 27 F.3d 487, 494 (10th Cir. 1994)).

As to Petitioner's first two grounds for relief, it is undisputed that Respondent Silversmith "did not enter the order of conviction or determine the duration of [Petitioner's] sentence; the Tribal Court did those things." *Id.* at 5. Accordingly, Respondent Silversmith explains that he "lacks the power to vacate the conviction and sentence." *Id.* Turning to the final ground of relief, which involved Petitioner's immediate release, Respondent Silversmith opines that "keeping [him] a party to this action would not serve the ends of justice, for he does not possess either of those things that the court requires when identifying a proper party-respondent to a petition for a writ of habeas corpus under the ICRA: namely, an individual "who has *both* an interest in opposing the

26

petition if it lacks merit, *and* the power to give the petitioner what he seeks if the petition

has merit - namely, his unconditional freedom." *Id.* at 4-5 (quoting *Poodry v. Tonawanda*

*Band of Seneca Indians,* 85 F.3d 874, 894 (2d Cir. 1996) (emphasis added) (internal citation

omitted)).   From his perspective, "[t]he only relief requested that ever involved [his]

power . . . is the prayer to immediately release [Petitioner] . . . but that has already

occurred." *Id.* at 5.  Consequently, Respondent Silversmith challenged that he "is not a

proper party-respondent to this action, and he should be dismissed." *Id.*

> 3.     Relevant law on proper party-respondents

"Since 1867, the writ of habeas corpus has incorporated the common-law command

that the writ shall be directed to the person in whose custody the party is detained." *Pa.*

*Bureau of Corr. v. U.S. Marshal Serv.*, 474 U.S. 34, 38 (1985) (internal quotation marks and

citation omitted).  In a 1985 opinion, the Supreme Court explained, "[i]t was the custodian

who then was to make return of said writ and bring the party before the judge who

granted the writ." *Id.* (internal quotation marks and citation omitted).  The Court then

observed, "Congress preserved this unambiguous directive throughout subsequent

revisions, and the current habeas corpus statute states that the writ 'shall be directed to

the person having custody of the person detained.'" *Id.* (citing 28 U.S.C. § 2243 (1982)).

Since 1948, that language has remained unchanged.   *See* 28 U.S.C. § 2243 (2006).

Furthermore, even in the  context of tribal habeas petitions, the Supreme Court has not

wavered from its holding that the proper "respondent in a habeas corpus action is the

individual custodian of the prisoner." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978).

For its part, the Tenth Circuit has also held, "[t]he law is well established that the proper respondent to a habeas action is the habeas petitioner's custodian." *Harris v. Champion*, 51 F.3d 901, 906 (10th Cir. 1995), *superseded by statute on other grounds*, Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat 3847, *as recognized in Knox v. Bland*, 632 F.3d 1290, 1292 (10th Cir. 2011).  In another case, the Tenth Circuit reached the same holding by incorporating persuasive authority from sister circuits.  *See Blango v. Thornburgh*, 942 F.2d 1487, 1492 n.10 (10th Cir. 1991).  By the Tenth Circuit's account, "[t]he rationale for naming as respondent the person actually holding the petitioner in custody is undisputed." *Id.* (citing *Reimnitz v. State's Attorney*, 761 F.2d 405, 408 (7th Cir. 1985) (finding the custodian is proper respondent "since habeas corpus challenges the lawfulness of the petitioner's custody, . . . [the proper respondent] shall be the person who has that custody")).  Thus, through both Supreme Court and Tenth Circuit jurisprudence, the courts have articulated the notion that the proper respondent to a habeas petition is the custodian who can "bring the party before the judge," or in other words, facilitate whatever habeas relief a court might grant.  *See Pa. Bureau of Corr.*, 474 U.S. at 38;  *Blango*, 942 F.2d at 1492 n.10.

4.      This case is moot as to Respondent Silversmith

Although the collateral consequences doctrine can act to save a habeas petition from mootness, no legal basis exists for maintaining Respondent Silversmith as a party to

the instant Petition.  Rather, I am convinced that a proper party-respondent to a tribal habeas petition must possess "both an interest in opposing the petition if it lacks merit, and the power to give the petitioner what he seeks if the petition has merit." *Poodry*, 85 F.3d at 899 (citations omitted).

At the time the Petition was filed, the Court acknowledges that Respondent Silversmith, as Petitioner's custodian, represented a proper party-respondent to the suit. *See Rumsfeld*, 542 U.S. at 434-36.  Nevertheless, following Petitioner's release, neither Respondent Silversmith nor McKinley County have any interest in opposing the instant Petition.  Moreover, Respondent Silversmith has no power "to give the petitioner what he seeks" if the instant Petition were found to have merit.  *See Poodry*, 85 F.3d at 899.  Because Respondent Silversmith bears neither the requisite interest or authority to remain a proper party-respondent in this case, I believe that no live case or controversy exists between Petitioner and Respondent Silversmith.  *See Meyers*, 200 F.3d at 718 (holding that the federal courts may only hear cases involving a live case or controversy, and finding that this requirement adheres at all stages of judicial proceedings).  Petitioner's arguments to the contrary are merely conclusory and lack any support in the law.  In fact, the argument sounds like an invitation to render an improper advisory opinion against Respondent Silversmith.  Consequently, I recommend that all claims made against Respondent Silversmith be dismissed as moot.

C.      Petitioner's Claims Against Respondent Hecht Are Also Moot

Following Petitioner's release from custody, the circumstances of his case have

acted to render his Petition moot.  I reach this conclusion on three bases.

First, the Petition lacks any meritorious claims outside of the claim that his sentence

exceeded the statutory maximum that the tribe could impose.  Therefore, the appropriate

remedy would be a vacatur of any sentence in excess of one-year.  Given this limitation

on the available remedy, granting the Petition would still leave Petitioner with a

conviction with a one-year sentence.  This relief would have no real impact because (1)

Petitioner has already been released, and (2) none of the collateral consequences claimed

by Petitioner would be removed.

Second, even if the Court found merit in all of the claims in the Petition, vacatur of

the sentence would be the extent of the available remedy.  The only claim in the Petition

which arguably undermines the convictions themselves (as opposed to only the sentence)

is the claim that Petitioner was denied his right to counsel before he pled guilty and

received imprisonment.  However, the remedy for such a violation is not vacatur of the

conviction.  Instead, it too is limited to vacatur of the sentence.  Given this limitation on

the available remedy, granting the Petition would still leave Petitioner with a conviction.

Again, this relief would have no real impact because (1) Petitioner has already been

released, and (2) none of the collateral consequences claimed by Petitioner would be

removed.

Finally, even assuming that Petitioner could be granted the full relief he seeks on all his claims, it would be the vacatur of four misdemeanor convictions. Given that he has been released from custody on these convictions, he bears the burden of demonstrating sufficient collateral consequences to meet Article III's "case or controversy" requirement. The collateral consequences to which he points are insufficient to do so. Each of these bases is discussed further below.

       1.     Petitioner's sentencing claim is the only plausibly meritorious claim and any relief on that claim would be ineffectual given Petitioner's relief

In the instant Petition, Petitioner advances four grounds for relief. These include that: (1) the Tohono O'odham Nation violated due process by imposing a sentence in excess of the one-year maximum provided by ICRA; (2) the Tribe violated his right to counsel by not according him the opportunity to retain counsel and by not making a record of his waiver of the right to counsel; (3) the Tribe violated due process by not following tribal procedures; and (4) Petitioner's constitutional rights were offended by his illegal incarceration in an off-reservation jail. *Doc. 1* at 3-6. As a threshold matter, none of these claims were exhausted, as required by the doctrine of comity, through the appropriate tribal procedures. *See supra,* section IV. Assuming, *arguendo,* that they had, a thorough examination of the pleadings and subsequent briefing makes clear that the only claim bearing some quantum of merit is Petitioner's first, alleging that the Tribe violated ICRA by imposing upon him a sentence in excess of one year. So that this

Amended PFRD might concentrate on that claim and its relevance in light of the collateral consequences doctrine, I will first discuss Petitioner's other claims.[14]

>            a.    Petitioner's claim that Tribe violated right to counsel is meritless

The second of Petitioner's four claims for post-conviction relief alleges that the Tohono O'odham Nation violated his right to counsel as provided for by ICRA. *Doc. 1* at 4; *see* 25 U.S.C. § 1302(6) (2006) (guaranteeing a tribal defendant "at his own expense to have the assistance of counsel"), *amended by* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2281 (codified as amended at 25 U.S.C. § 1302). To support the claim, Petitioner posits that "there is no record that [Petitioner] waived his right to counsel." *Doc. 1* at 4. Further, he argues that "[h]e had no opportunity to request [] an attorney while in jail between the arrest and the plea hearing." *Id.* Thus, Petitioner opines, "after serving close to eleven months in jail, [Petitioner] plead [sic] guilty, and was issued an illegal sentence, all without any advice or assistance of counsel." *Id.*

The deficiencies of this claim were made manifest at a Motions Hearing I conducted on July 13, 2011. *See doc. 35.* At that hearing, this Court probed counsel for Petitioner to explain the legal basis for this claim. In response, three bases were advanced. First,

---

[14]    The Court recognizes that Petitioner has never briefed the merits of his claims. Given the relevance of the merits to the mootness issue, the parties could have addressed the merits in supplemental briefing. Nonetheless, the parties were given the opportunity for oral argument on these merits questions and will have an opportunity to dispute the analysis in their Objections to the Amended PFRD.

counsel for Petitioner averred that Petitioner was denied the right to counsel by not being advised of his right to retain counsel. *Id.* at 2. When pressed as to whether ICRA imposed this obligation upon the Tribe, counsel demurred, and explained instead that the right derived from the U.S. Constitution. *Id.* After conferring with co-counsel, however, he retracted this argument, and claimed instead that the right derived from ICRA. *Id.*

Unfortunately for Petitioner, no such right exists in ICRA. *See* 25 U.S.C. § 1302. Furthermore, the rights to counsel that derive from the Sixth, and to a lesser extent, the Fifth Amendment of the U.S. Constitution, do not circumscribe the activities of Indian tribes. *See Talton v. Mayes*, 163 U.S. 376, 384 (1896). Consequently, even if this claim had been exhausted, I would still recommend it be denied.

As his second and third bases for granting this claim, Petitioner's counsel alleges that Petitioner's eleven-month incarceration preceding his plea might have violated the Speedy Trial Act, and moreover, that his plea might have been rendered unknowingly and involuntarily. *Doc. 35* at 3. These grounds, however, had never been advanced in any of Petitioner's pleadings. *Id.* Correspondingly, I instructed Petitioner's counsel to direct this Court to some place in the instant Petition where these claims could be found. *Id.* Counsel could not do so. *Id.* at 3-4. Rather, Petitioner's counsel contended that there was no record to evidence whether Petitioner had an opportunity to ask for counsel or to prove his plea was entered knowingly and voluntarily. *Id.* at 3. Even when I discussed with Petitioner's counsel the fact that a record need not exist to make a claim, and that a client's averment

33

could be sufficient, it became clear that no basis for this ground existed whatsoever. *Id.*

at 4. Instead, these arguments were being advanced, not on information and belief, but

because they had yet to be disproved by a record. Such proffers do not comport with the

Federal Rules of Civil Procedure or Tenth Circuit case law. *See* FED. R. CIV. P. 11 (requiring

pleadings be, among other thing, well grounded in fact); *Coffey v. Healthtrust, Inc.*, 1 F.3d

1101, 1104 (10th Cir. 1993) ("The attorney has an affirmative duty to inquire into the facts

and law before filing a pleading."). Because these grounds were neither articulated in the

instant Petition nor advanced upon information and belief by counsel, even if they had

been exhausted at the tribal level, I would still recommend they be denied.

> b. Petitioner's allegation regarding a due process violation because the Tribe did not follow its own law and procedure fails to state a claim.

Petitioner's third argument for post-conviction relief, in its entirety, reads:

> There is no record that the Tribal Court followed its own law and procedure in this prosecution. Nor is there any record that [Petitioner] waived his rights under the Indian Civil Rights Act. The available record shows that [Petitioner] was prosecuted in Tribal Court only. [Petitioner] understood and acted upon the belief that he would also have a federal prosecution. In such case, his right to Sixth Amendment counsel would attach. That did not happen.[15]

*Doc. 1* at 4-5. In response, Respondent Hecht contends Petitioner's sentence "was imposed

---

[15]     Because Petitioner's subjective understanding and actions relative to a potential federal suit are wholly irrelevant to his rights under ICRA or the Tribe's exercise of authority, I will not address this contention. What rights would have attached in a federal forum have no bearing on the instant Petition.

pursuant to the Plea Agreement entered into by Petitioner." *Doc. 16* at 4-5.  Further, he

states that "[a]ll aspects of the proceeding and sentence are in accordance with the Indian

Civil Rights Act and all other applicable laws." *Id.* at 5 (citing 25 U.S.C. § 1301 *et. seq.*).

Having reviewed the parties' briefing and entertained oral argument, I find no

substantiation for the contention that the Tribe violated Petitioner's due process rights.

Despite Petitioner's attestations, he again communicates no basis for the claim that

the Tohono O'odham Nation violated his due process rights.  Instead, Petitioner returns

to the lack of a record as justification for this ground.  Were this Court to entertain

Petitioner's interpretation of an attorney's duty to investigate claims before advancing

them, the absence of a record could ostensibly support any claim, regardless of the factual

basis, so long as no extant evidence disproved it before filing.[16]  The Federal Rules of Civil

Procedure require more.  *See* FED. R. CIV. P. 11; *Eisenberg v. Univ. of N. M.*, 936 F.2d 1131,

1134 (10th Cir. 1991) (holding that Rule 11 imposes on each attorney and each party,

represented or *pro se*, to conduct a reasonable inquiry into the validity and accuracy of a

pleading before it is filed).

To be sure, Petitioner rightfully claims that no record yet exists to show that the

---

[16]     The speculative nature of these contentions was exemplified at oral
argument, where counsel for Petitioner announced his belief that there were more
violations of Petitioner's rights, but he couldn't articulate them based on the lack of a
record. *Doc. 35* at 3.

Tribe followed its own procedure.  Similarly, no record exists[17] to demonstrate that Petitioner "waived his rights under the Indian Civil Rights Act." *Doc. 1* at 4.  But again, lack of pre-existing, contradictory proof does not justify the filing of a claim.  Petitioner must put forward some basis, some alleged fact, or some foundation, based on reasonable belief and investigation, for his claims.  *See* FED. R. CIV. P. 11*; White v. Gen. Motors Corp., Inc.,* 908 F.2d 675, 680 (10th Cir. 1990) ("A good faith belief in the merit of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances.").  In fact, even to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a complaint that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  *Twombly*, 550 U.S. at 555.  Because Petitioner has failed to state a claim to relief that is plausible on its face, even if it had been exhausted, I would still recommend that it be dismissed.

---

[17]     Had Petitioner exhausted his tribal remedies, whatever record did exist would likely be in his possession.  The desire to develop a record underpins the judicially-created doctrine of comity.

    c. Petitioner's claim that his constitutional rights were violated
      by his incarceration at an off-reservation facility is meritless.

As his fourth habeas challenge, Petitioner contends that his rights as a United States citizen have been violated by his incarceration at an off-reservation facility. *Doc. 1* at 5. By his account, Petitioner "is entitled to the constitutional protections afforded to all Americans." *Id.* Regardless of "whether or not" his current incarceration violates ICRA, he posits that the incarceration "violates his right to due process and his right to a fair hearing." *Id.* Ultimately, Petitioner concludes that "since the contract that the Indian Tribe has with the off-reservation jail facility is paid for by the federal government, the detention must be lawful and not in violation of the Indian Civil Rights Act and the United States Constitution." *Id.*

Respondent Silversmith counters, claiming that Petitioner cannot maintain an action under 42 U.S.C. § 1983 for deprivation of his constitutional rights under color of law. *Doc. 27* at 5. He explains that "a writ of habeas corpus is not the appropriate cause of action to challenge a prisoner's conditions of confinement, to obtain money damages, or to seek declaratory and injunctive relief." *Id.* at 6 (citations omitted). Further, he argues that "[t]o the extent that [Petitioner] intends the findings he requests . . . to be directed at [Respondent Silversmith] - who is no longer his custodian - they would amount to declaratory relief, which is plainly not available under the ICRA." *Id.* Most importantly, he cites to relevant case law for the proposition that "the Tenth Circuit has foreclosed an

action against [Respondent Silversmith] for alleged violation of [Petitioner's] constitutional rights under color of tribal law." *Id.* (quoting *Sulcer v. Davis*, 986 F.2d 1429 (10th Cir. 1993) (unpublished) (additional citations omitted)).

At this juncture, I can find no authority to support Petitioner's claim that his due process rights have been violated by his incarceration at an off-reservation facility. Procedural due process under the Fourteenth Amendment of the United States Constitution requires that "government action depriving a person of life, liberty or property . . . be implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987). In so doing, "[t]he Fourteenth Amendment fundamentally restructured the relationship between individuals and the States and ensured that States would not deprive citizens of liberty without due process of law." *Zelman v. Simmons-Harris*, 536 U.S. 639, 678 (2002) (Thomas, J., concurring).

The protections of the Fourteenth Amendment, however, do not apply to the tribes. To the contrary, the Supreme Court has held, in the most unambiguous terms, that "it has been understood for more than a century that the Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes." *Nevada v. Hicks*, 533 U.S. 353, 383 (2001) (citation omitted). For its part, the Tenth Circuit has similarly held that "Indian tribes are not states of the union within the meaning of the Constitution, and the constitutional limitations on states do not apply to tribes." *Chapoose v. Hodel*, 831 F.2d 931, 934 (10th Cir. 1987) (internal quotation marks and citations omitted).

38

Recognizing both Supreme Court and Tenth Circuit precedent, Petitioner would have to demonstrate some action, other than that of the Tohono O'odham Nation, to support a due process violation.  Despite his efforts, Petitioner has made no such showing.  By his own admission, Petitioner entered his incarceration pursuant to a contract between the Tribe and the off-reservation jail facility.  *Doc. 1* at 5.  The process leading to that incarceration - and the sentence resulting in that incarceration - originated with the Tribe, and not with Respondent Silversmith.  Accordingly, whatever redress Petitioner might seek from Respondent Silversmith would necessarily sound in 42 U.S.C. § 1983 for deprivation of his constitutional rights under color of law.  At all times relative to Petitioner, however, Respondent Silversmith acted, pursuant to contract, under color of tribal law.  As such, under Tenth Circuit law, the Tribe's actions cannot substantiate a suit under 42 U.S.C. § 1983.  *McKinney v. State of Okla., Dept. of Human Servs.,* 925 F.2d 363, 365-66 (10th Cir. 1991) (citing *Evans v. McKay*, 869 F.2d 1341, 1347 (9th Cir. 1989); *R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir. 1983)); *see Santa Clara Pueblo*, 436 U.S. at 61 (holding that the only relief available in federal court under ICRA is habeas corpus).  As a consequence, even if Petitioner had exhausted this claim, I would still recommend that his argument of due process violation by virtue of incarceration at an off-site facility be denied.

> d.     Claim that sentence exceeded statutory maximum

Although now settled by statutory amendment, Petitioner's first claim remained

an area of unsettled law at the time of his sentence.  In contrast with his second, third, and fourth grounds, to understand the potential merits of his first claim, some background examination of Federal Indian Law is necessary.

i.      Relevant law on tribal sentencing authority

Each federally recognized Indian tribe is a dependent domestic sovereign, and although they retain some indicia of sovereignty, their jurisdiction over criminal matters has been greatly diminished relative to the states and federal government.  Since at least the time of *Oliphant v. Suquamish*, it has been well-settled that tribes may not exercise criminal jurisdiction over non-Indians.  *Oliphant v. Suquamish*, 435 U.S. 191, 206 (1978).

On the other hand, tribes may exercise criminal jurisdiction over all members of a federally recognized tribe, so long as the crime does not fall within one of the congressionally-created exceptions.  The first of these exceptions precludes tribes from prosecuting an Indian for a major crime under the Major Crimes Act.  18 U.S.C. § 1153 (2006).  The second, known as the Indian Country Crimes Act or General Crimes Act, creates federal court jurisdiction for certain types of offenses committed by Indians against non-Indian victims and for all offenses committed by non-Indians against Indian victims.  18 U.S.C. § 1152 (2006).

For those Indians over which a tribe is exercising criminal jurisdiction, the federal government has provided numerous protections through ICRA, which was first signed into law in 1968.  At the time of Petitioner's conviction, ICRA mandated that "[n]o Indian

tribe in exercising powers of self-government shall . . . require excessive bail, impose excessive fines, inflict cruel and unusual punishments, *and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year* and a fine of $5,000." 25 U.S.C. § 1302(7) (emphasis added), *amended by* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2281 (codified as amended at 25 U.S.C. § 1302).[18] Furthermore, ICRA, as it existed at the time of Petitioner's conviction, prohibited the tribe from denying an accused the "right to have the assistance of counsel for his defense," so long as counsel was provided "at his own expense." 25 U.S.C. § 1302(6). Under these pre-2010 provisions, tribes were essentially limited to prosecuting misdemeanors, since felonies have traditionally been defined as those crimes for which incarceration of one year or more could be imposed. Further, as ICRA stood at the time of Petitioner's conviction, no right to tribally-appointed counsel existed, whatsoever, for criminal defendants.

With the passage of the Tribal Law and Order Act of 2010 ("TLOA"), Congress expanded tribal sentencing authority to allow for sentences in excess of one year. Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2279 (codified as amended in 25 U.S.C. § 1302). Under the expanded authority conferred by TLOA, tribes may now impose upon defendants a term of incarceration of up to three years for any one offense, and a

---

[18]        Constrained as it may seem, even the power to impose a one-year sentence was not initially conferred by Congress. Rather, by an amendment to ICRA passed in 1986, Congress raised tribal authority to imposes sentences from a maximum of six months imprisonment and a fine of $500 to a maximum of one year imprisonment and a fine of $5,000. Pub. L. No. 99-570, 100 Stat. 3207-146.

total penalty of up to nine years incarceration in any criminal proceeding.  *See* 25 U.S.C. § 1302(a)(7)(C), (D).   Nevertheless, for tribes to invoke the authority to sentence a defendant to a total term of more than one year incarceration, they must implement numerous procedural and substantive safeguards, including, among others, free counsel for the indigent, publication of laws, and provision of learned jurists.  *See* 25 U.S.C. § 1302(c).

> ii.   Petitioner's consecutive sentences represented an unsettled matter of law at the time of his sentencing

As detailed above, Congress has now explicitly conferred upon the tribes the authority to sentence criminal defendants in excess of one year, so long as adequate safeguards are provided.  *See* 25 U.S.C. § 1302(c).  At the time of Petitioner's sentencing, however, no such explicit authority existed.  Instead, tribes, at times, engaged in the practice of imposing multiple sentences of one year or less, with the additional mandate that they be run consecutive to one another.  This practice, known as "stacking," allowed tribes to circumvent the one-year maximum provided for by ICRA.  Furthermore, it was this practice that resulted in Petitioner's 1260-day sentence.[19]

---

[19]      Records of the Judicial Court of the Tohono O'odham Nation reflect that Petitioner entered a plea agreement, on June 24, 2008, to plead guilty to the following counts and to receive these corresponding sentences: (1) Conspiracy - 180 days; (2) Aggravated Assault - 360 days; (3) Aggravated Assault - 360 days; and (4) Misuse of a Weapon - 360 days.  *Doc. 1*, attach. 4 at 1-2..  The plea agreement also communicated to Petitioner that he would receive "1,260 days jail."  *Id.*  Pursuant to this agreement, on June 25, 2008, the Judicial Court of the Tohono O'odham Nation sentenced Petitioner to 1,260 days incarceration.  *Doc. 1*, attach. 5.

In 2008, no tribe could look to either the Supreme Court or the Unites States Courts

of Appeals for guidance on whether the practice of stacking comported with the intent of

ICRA.[20]  Rather, the only published opinion on the subject derived from the U.S. District

Court for the District of Minnesota.  *Spears v. Red Lake Band of Chippewa Indians*, 363 F.

Supp. 2d 1176 (D. Minn. 2005).  In the *Spears* case, the Defendant Rodney Spears ("Spears")

was charged by the Red Lake Tribal Court with six separate charges: (1) negligent

homicide; (2) driving under the influence of alcohol ("DUI"); (3) failing to take a blood,

breath, or urine test; (4) failing to stop at the scene of a traffic accident; (5) driving without

a license; and (6) a liquor violation.  *Id.* at 1177.  Each charge arose from the same April 1,

2000, incident, in which Spears did the following:

> Intoxicated and lacking a valid driver's license - drove his car within
> the Red Lake Indian Reservation.  Tragically, he struck and killed a
> person lying on the road. He neither stopped, notified police, nor
> rendered assistance. Instead, he drove to his sister's house and did
> nothing.

*Id.* at 1176.  At the tribal court, Spears was represented by counsel and pleaded guilty to

all six charges.  *Id.* at 1177.  He was sentenced to twelve (12) months incarceration for the

negligent homicide, and six months each for the DUI, sobriety test, and failure to stop

---

[20]      Whether the practice of stacking comported with the United States
Constitution and the Sixth Amendment right to counsel is irrelevant.  Since at least
1896, the Supreme Court has recognized that because "the powers of local self-
government" enjoyed by tribes "existed prior to the constitution," the tribes "are not
operated upon" by the limitations of the U.S. Constitution.  *See Talton v. Mayes*, 163 U.S.
376, 384 (1896).

violations.  *Id.* As the sentences were imposed to run consecutively, the result was a thirty-month sentence.  *Id.*[21]

After exhausting his appeals with the Red Lake Band, Spears filed a petition for the writ of habeas corpus, claiming that ICRA barred his thirty-month sentence, since, by his account, he only committed the single offense of "unlawful driving resulting in the death of another person."  *Id.*  For its part, the Red Lake Band argued that Spears' sentence complied with ICRA since his driving behavior constituted "multiple distinct offenses." *Id.* Following a hearing on the issue, the United States Magistrate Judge assigned to the case recommended the dismissal of Spears' claims.

On its *de novo* review, the district court began by scrutinizing the text of ICRA. Despite noting that the words of ICRA are explicit, in its provision that an "Indian tribe in exercising powers of self-government shall . . . in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year [or] a fine of $5,000, or both," the district court observed that the phrase in "any one offense" is ambiguous.  *Id.* at 1178 (quoting 25 U.S.C. § 1302(7)).  After analogizing this ambiguity to Supreme Court jurisprudence related to the Fifth and Sixth Amendments, the Court remarked that "any one offense" might mean "any discrete violation of the Tribal Code" or "any prosecution arising from a single criminal transaction or episode."

---

[21]     Under the doctrine of dual sovereignty, Spears was also convicted of involuntary manslaughter in federal court.  He received a fourteen-month sentence for that offense.

*Id.* Therefore, because the Court found the phrase ambiguous, it held that it must "consider the purpose, the subject matter and the condition of affairs which led to its enactment," and construe it "to effectuate the underlying purposes of the law." *Id.* (citing *United States v. Mcallister*, 225 F.3d 982, 986 (8th Cir. 2000)).

As a consequence, the district court went on to chronicle the legislative history of ICRA. It noted that counsel provided by the tribe was considered by Congress "too great a financial burden for already impoverished tribes," and therefore, the enacted version of ICRA limited tribal court sentences to six months, with no guarantee of publicly provided counsel. *Id.* (internal quotation marks and citations omitted). Following initial passage in 1968, the district court recounted that ICRA "was amended to 'enhance the ability of tribal governments to prevent and penalize the traffic of illegal narcotics.'" *Id.* (citing Pub. L. No. 99-570 § 4217, 100 Stat. 3207-146 (Oct. 27, 1986)). By that amendment, tribal authority to sentence was expanded from six months to one year. *Id.* At the time of *Spears*, however, no other amendment to ICRA had been passed.

At the time of ICRA's passage in 1968, the *Spears* court recounted that "the Supreme Court had not yet definitively established a constitutional right to state-provided counsel in non-felony cases." *Id.* (citing *Beck v. Winters*, 407 F.2d 125, 127-28 (8th Cir. 1969)) ("[T]he Supreme Court of the United States has not expressly extended the Sixth Amendment right to assistance of counsel to misdemeanor cases."); *cf. Gideon v. Wainwright*, 372 U.S. 335 (1963) (establishing the right to assistance of counsel in felony

45

cases). According to the *Spears* court:

> States, at that time, were not constitutionally required to provide counsel for indigent defendants exposed to sentences of six months or less. Since tribal court defendants could "in no event" be sentenced to more than six months under the ICRA, Congress could see that if it required publicly provided counsel, it would de facto impose a greater duty upon the tribes than the Constitution then imposed upon the states.

*Id.* at 1180. Thus, the *Spears* court reasoned, "it made perfect sense for Congress to exclude publicly funded counsel from ICRA." *Id.*

In those instances where Indians were to be prosecuted for serious crimes, the *Spears* court noted that the Major Crimes Act, which governs felony prosecution in Indian Country, would ensure "the full panoply of constitutional rights in federal court." *Id.* (citing 18 U.S.C. § 1153). Therefore, the *Spears* court reasoned that "[t]aken together, [ICRA] and the Major Crimes Act created a balanced and logical regime: Indians accused of minor crimes faced minor penalties in tribal court where some constitutional rights were withheld; Indians accused of serious crimes faced serious penalties in federal court where all constitutional rights were available." *Id.* Furthermore, the *Spears* court found that "this balance can be maintained only if 'any one offense' is interpreted to mean 'a single criminal transaction.'" *Id.* Otherwise, the court reasoned, "tribal court defendants would be routinely exposed to serious sentences for minor crimes without guaranteeing them all their basic constitutional rights . . . Congress surely did not intend this result." *Id.* (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)).

Based upon its examination of the legislative history and intent of ICRA, the *Spears* court held "that Congress intended to adopt the concept that separate crimes arising from a single criminal episode should normally be treated as a single offense for sentencing purposes." *Id.* at 1180. The court went on to hold: "[c]onsidering the foregoing, the Court is convinced Congress did not intend to subject tribal court defendants to many years' imprisonment - without any right to publicly funded counsel - under the guise of a statute ostensibly extending the benefits of the United States Constitution." *Id.* at 1181. As a result, the *Spears* court ultimately held ICRA's phrase "any one offense" to mean "a single criminal transaction." *Id.*

Based on its reasoning regarding ICRA, the *Spears* court found that the violations underlying Spears' tribal court sentence were facets of a single criminal event. *Id.* at 1182. Because it found that ICRA limited tribal court sentences to 12 months of imprisonment for any "one offense," the court declared the tribal sentence illegal and granted the writ of habeas corpus.

As it originated in the District of Minnesota, the *Spears* holding constituted only persuasive value to the Tohono O'odham Nation at the time it sentenced Petitioner to his 1,260-day sentence. In fact, since Petitioner's sentencing, the Ninth Circuit has explicitly held that stacking is within the sentencing authority of the tribes under ICRA.[22]   *See*

---

[22]   The Ninth Circuit in *Miranda* was reviewing ICRA as it existed at the time of Petitioner's sentencing.

*Miranda v. Anchondo*, Nos. 10-15167, 10-15308, 2011 WL 3607130 (9th Cir. Aug. 17, 2011); *see also Bustamante v. Valenzuela*, 715 F. Supp. 2d 960 (D. Ariz. 2010). Thus, rather than being prohibited from the practice of "stacking" the sentences of criminal defendants, the law could properly be classified as unsettled at the time of Petitioner's sentencing.

> iii.   Petitioner's argument that the Tribe exceeded its statutory authority by stacking his sentences is not meritless.

Unlike the Ninth Circuit, no published opinion of either the Tenth Circuit or the District of New Mexico has held that the pre-2010 ICRA permitted the practice of stacking sentences. In fact, two unpublished rulings from within the District of New Mexico granted relief to petitioners who were subjected to stacked sentences under ICRA. *Pacheco v. Massingill*, No. 1:10-cv-00923-RB-WDS, slip op. at 2; *Calabaza v. Massingill*, No. 1:10-cv-01207-JCH-WDS, slip op. at 3. However, the persuasive authority of those opinions is circumscribed because (1) they preceded the Ninth Circuit's *Miranda* opinion, and (2) in both cases, the tribe refused to respond to the petitions in any way. *See supra* n.11, 12. Nonetheless, with the guidance of these opinions and the *Spears* opinion, Petitioner's claim for relief was not meritless if he had exhausted his claims.

> e.   Even if redress was granted on the sentencing claim, Petitioner's collateral consequences would remain the same

In the event Petitioner's sentencing claim had been found meritorious, a concomitant remedy would have been recommended by this Court. Petitioner has asked

this Court to "find the 1260 day sentence illegal and in violation of the Indian Civil Rights Act, and vacate the sentence." *Doc. 1.* at 5. As to the first of these remedies, the Court could be convinced to do so. As to the second, which requests this Court vacate Petitioner's sentence *in toto*, such redress would surpass the scope of the alleged harm. Having examined the available case law, this Court remains convinced that the maximum relief available to Petitioner, were he to prevail on his sentencing claim, would be the vacatur of all but 365 days of his sentence, which represented the Tribe's maximum sentencing authority at the time of Petitioner's sentencing.

At the time of Petitioner's conviction and sentence, ICRA mandated that "[n]o Indian tribe in exercising powers of self-government shall . . . require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and a fine of $5,000." 25 U.S.C. § 1302(7), *amended by* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2281 (codified as amended at 25 U.S.C. § 1302). Although the *Spears* court found that ICRA did not authorize the stacking of misdemeanor sentences, ICRA's plain language, at the time of Petitioner's conviction, made clear that tribes *did* possess the authority to sentence a criminal defendant to a sentence of *up to one year*. *See id.* Viewed from the obverse perspective, were the practice of stacking considered violative, ICRA guaranteed to Petitioner the right to not be sentenced to more than one year of incarceration. *See id.* Therefore – had Petitioner

exhausted his tribal remedies, had he still been in custody, and had he prevailed on this singular, potentially meritorious issue – the maximum relief this Court could recommend would be a vacatur of the sentence which exceeded one year.  The convictions would remain as would a one-year total sentence for them.[23]  Only by recommending this remedy could this Court adhere to the Tenth Circuit's guidance that "the remedy ought to fit the right."  *United States v. Jackson*, 493 U.S. 1179, 1183 (10th Cir. 2007).

Given this remedial limitation, the collateral consequences claimed by Petitioner would be unaffected by judicial action.  These collateral consequences, as alleged by Petitioner, include: (1) the possibility that his convictions may be used to impeach Petitioner as a witness in future testimony; (2) the possibility that his convictions may be used to enhance any sentences received for future criminal offenses; (3) that these convictions may prompt the majority of colleges to deny Petitioner admission; (4) that a criminal history may hinder future employment; and (5) that public employment could be denied to him based on these convictions.  *Doc. 26* at 9-10; *Doc. 33* at 8-11.  As Petitioner's own briefing makes patent, each of these claimed collateral consequences flow not from his sentence, but from the various convictions themselves.  Moreover, at the Motions Hearing I convened on this issue, Petitioner's counsel admitted this proposition.

---

[23]      While some proceedings continue in the *Pacheco* and *Calabaza* cases, it is notable that, while the Court found ICRA violations in those unopposed petitions, the prisoner were only ordered released.  *Pacheco v. Massingill*, No. 1:10-cv-00923-RB-WDS; *Calabaza v. Massingill*, No. 1:10-cv-01207-JCH-WDS.  The underlying convictions were not vacated.

*Doc. 35* at 5.  Recognizing that whatever collateral consequences may exist in this case stem from Petitioner's conviction, the maximum relief this Court could recommend would have no effect.  In such an instance, where this Court can recommend no effectual relief for Petitioner, the instant Petition must be considered moot.  *See United States v. Quezada-Enriquez*, 567 F.3d 1228, 1231 (10th Cir. 2009) ("Once it becomes impossible for a court to grant effectual relief, a live controversy does not exist, and a case is moot.") (citation omitted); *see also Green v. Granson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (case is moot where entry of judgment in petitioner's favor would amount to nothing more than a declaration he was wronged).  Because of the absence of collateral consequences which can be remedied by judicial action, I recommend the instant Petition be dismissed as moot.

> 2.  Assuming, *arguendo*, Petitioner could prevail on all claims, the maximum relief possible would be vacatur of his sentences and not his convictions which makes his Petition moot

Alternatively, even if each of Petitioner's properly pled claims were found meritorious, the relief available for this Court to recommend would confer no effectual redress to Petitioner.  In that best case scenario, where Petitioner prevails on each and every claim, the maximum relief available for this Court to recommend would be a vacatur of his entire sentence, rather than the vacatur of the convictions themselves.  *See Jackson,* 493 F.3d at 1181-84.

Whatever redress this Court could recommend derives from the rights alleged to have been offended.  *See id.* at 1183 (holding that "the remedy ought to fit the right").  The

51

instant Petition avers the breach of the following rights: (1) the Tribe violating due process

by imposing a sentence beyond the one-year maximum allowed by ICRA; (2) the Tribe

violating his right to counsel; and (3) a claim of constitutional deprivation based on

incarceration in an off-reservation facility.  *See doc.* 1 at 3-6.[24]  Petitioner has made no

argument, either through pleadings, briefing, or oral argument of actual innocence.  From

his claims, this Court construes three separate rights which Petitioner alleges to have been

abridged.  Each of these rights, including: (1) the right to not be sentenced to more than

one year incarceration by a tribal court under ICRA, (2) the right to retain counsel at one's

own expense under ICRA, and (3) the third, more nebulous claim of right to not be jailed

in an "off-reservation" jail as a product of deficient tribal process, each correlate to a

separate remedy.  *See id.*  As explained above, the appropriate remedy for the first alleged

violation would be vacatur of any sentence above one year.  Whatever hypothetical claim

could be crafted for the third ground would clearly not impact Petitioner's convictions,

as it exclusively concerns his off-reservation incarceration.[25]  Therefore, the remedy for

these two claims would not remove the Petitioner's convictions themselves.  Now, the

Court must examine if the alleged violation of the right to counsel could garner broader

---

[24]    As described above, the Petition's claim about a due process violation for failing to follow procedures fails to meet the bare minimum pleading requirements and, therefore, is not addressed here.

[25]    I make this statement for no other purpose than advancing the discussion. Case law forecloses the ability to succeed, or even make, this claim.  *See supra*, section V(C)(1)(c).

relief for Petitioner.

Although the Tenth Circuit has yet to address what relief should flow in relation to the denial of retained counsel under ICRA, it has scrutinized the issue of what remedy to accord a criminal defendant who is denied the Sixth Amendment right to counsel during state misdemeanor proceedings.  Even though the "Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes,"[26] ICRA does apply a number of identical or analogous safeguards to Indian tribes.  *See* 25 U.S.C. § 1302; *see also United States v. Cavanaugh*, 643 F.3d 592, 596 (8th Cir. 2011) ("Congress passed the Indian Civil Rights Act, selectively applying some, but not all, protections from the Bill of Rights to situations where an Indian tribe is the governmental actor.").  Among these analogous safeguards, at  the time of Petitioner's sentencing, was the right to retain counsel at one's own expense in any criminal proceeding.  25 U.S.C. § 1302(7), *amended by* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2281 (codified as amended at 25 U.S.C. § 1302).  Because as a legal and practical matter, the courts widely recognize the analogy between these rights, the Tenth Circuit's guidance on the proper relief where a state's failure to appoint a criminal defendant counsel violated the Constitution is particularly persuasive.

In *United States v. Jackson*, the Tenth Circuit scrutinized the right to counsel in misdemeanor proceedings and the relief that would attend a violation of that right.  *See*

---

[26]        *Hicks*, 533 U.S. at 383–84.

*Jackson*, 493 F.3d at 1181-84.  Based upon their reading of Supreme Court jurisprudence,

they reasoned that "the Sixth Amendment's purposes are served if counsel is appointed

in any trial involving a sentence of 'actual deprivation of a person's liberty.'"  *Id.* at 1181

(quoting *Argersinger v. Hamlin*, 407 U.S. 25, 40 (1972)).  Additionally, the *Jackson* court

detailed the extension of the Sixth Amendment right to counsel to the arena of suspended

terms of imprisonment.  *Id.* at 1182.  To that end, the Tenth Circuit recounted the Supreme

Court's holding that:

> Once the [suspended] prison term is triggered, the defendant is
> incarcerated not for the probation violation, but for the underlying
> offense, and thus ends up having his or her liberty deprived as a
> result of an uncounseled conviction - precisely what the Sixth
> Amendment, as interpreted by *Argersinger* and *Scott*, does not allow.

*Id.* (quoting *Alabama v. Shelton*, 535 U.S. 654, 662 (2002) (internal quotation marks omitted).

From the holding in *Shelton*, the Tenth Circuit found that "the Sixth Amendment right at

issue protects individuals against being sentenced to a deprivation of liberty without the

benefit of counsel."  *Id.* at 1183.  Consequently, where a violation of that right occurs, the

Tenth Circuit explicitly held "the proper remedy was to vacate that portion of the sentence

offensive to the Sixth Amendment without doing harm to the defendant's conviction or

the remaining, constitutionally inoffensive, portions of his sentence."  *Id.*  "To go further,"

and to hold the conviction infirm, "would be to relieve the defendant from any

consequence of his or her actions."  *Id.*

   Based upon the holding in *United States v. Jackson*, I find that the maximum relief

54

available to Petitioner, even if he had exhausted his claims and thereafter prevailed on all

grounds, would be the vacatur of his entire sentence.  *See Jackson,* 493 F.3d at 1181-84.

Consequently, the collateral consequences he faces as a product of his convictions would

remain unaffected by judicial action.[27]  Therefore, the Petition must be considered moot.

*See Quezada-Enriquez,* 567 F.3d at 1231 ("Once it becomes impossible for a court to grant

effectual relief, a live controversy does not exist, and a case is moot.") (citation omitted);

*see also Green,* 108 F.3d at 1300 (finding that a case is moot where entry of judgment in

petitioner's favor would amount to nothing more than a declaration he was wronged).

Given the absence of collateral consequences which can be remedied by judicial action, I

recommend the instant Petition be dismissed as moot.

> 3.    The collateral consequences of four misdemeanor convictions are insufficient to give Petitioner a substantial stake in the outcome of the case

As described above, the undersigned concludes that Petitioner's only claim with

colorable merit concerns the length of his sentence.[28]  Based upon that conclusion, it is

clear that the instant Petition has become moot.  However, the conclusion of mootness

would remain even if the other claims had merit.

---

[27]    Petitioner's alleged collateral consequences have been explained previously in this Amended PFRD.  *See supra,* section V(C)(2).  Moreover, Petitioner's counsel, through oral argument, has admitted that these collateral consequences flow from his convictions rather than his sentence.  *Doc. 35* at 5.

[28]    *See supra,* section V(C)(1).

Recall that "once a sentence has expired, a habeas petitioner must show a concrete and continuing injury, i.e., a collateral consequence of the conviction, in order to continue his action." *Wilcox*, 43 F. App'x at 211-12 (citing *Spencer*, 523 U.S. at 7-8). Petitioner has not met this burden.

According to Petitioner's own argument, the tribal court cannot impose a term of imprisonment greater than one year. Thus, any conviction arising from a tribal court would be a misdemeanor. Consistent with this conclusion, Petitioner received no more than misdemeanor punishment on each of the four counts of conviction.[29] Consequently, his record reflects four misdemeanor convictions.

Of the five collateral consequences alleged to flow from Petitioner's misdemeanor convictions, none satisfy the Supreme Court's requirement of a "concrete and continuing injury" sufficient to save the instant Petition from mootness. *See Spencer*, 523 U.S. at 7. The relevant consequences, as alleged by Petitioner, include: (1) the possibility that his convictions may be used to impeach Petitioner as a witness in future testimony; (2) the possibility that his convictions may be used to enhance any sentences received for future criminal offenses; (3) that these convictions may prompt the majority of colleges to deny Petitioner admission; (4) that a criminal history may hinder future employment; and (5)

---

[29] Petitioner entered a plea agreement, on June 24, 2008, to plead guilty to the following counts and to receive these corresponding sentences: (1) Conspiracy - 180 days; (2) Aggravated Assault - 360 days; (3) Aggravated Assault - 360 days; and (4) Misuse of a Weapon - 360 days. *Doc. 1*, attach. 4 at 1-2.

that public employment could be denied to him based on these convictions. *Doc. 26* at 9-10; *Doc. 33* at 8-11. Clearly, the third, fourth, and fifth alleged consequences are so speculative as to merit little discussion. *See e.g., Lane*, 455 U.S. at 632-33 (possible effect on employment prospects is not a sufficient collateral consequence); *United States v. L.C.D.*, 399 F. App'x 129, 131 (8th Cir. 2010) *(*"Purely speculative collateral consequences cannot overcome a finding of mootness.") (citation omitted); *Wickstrom v. Schardt*, 798 F.2d 268, 270 (7th Cir. 1986) (holding that collateral consequences must be serious legal consequences, not mere injury to reputation).[30] Furthermore, extant case law serves to foreclose Petitioner's first and second claimed consequences.

The first consequence claimed by Petitioner concerns the possibility that his misdemeanor convictions may be used to impeach him should he testify in a future judicial proceeding. *Doc. 26* at 10. Despite his challenge, Petitioner has provided this Court with no authority to support the proposition that his misdemeanor convictions represent competent impeachment material. In fact, misdemeanor convictions are competent for purposes of impeaching a witness in a federal trial only if they involve "dishonesty or false statement." FED. R. EVID. 609(a) (2011) (providing that "evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject

---

[30] Although available case law has yet to decide whether denial of admission to post-secondary education or denial of public employment based on *misdemeanor* sentences represent competent collateral consequences, the holding in *Lane* persuades this Court they do not. *See Lane v. Williams*, 455 U.S. 624, 632-33 (1982).

to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted;" and "evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness").[31]  Both the New Mexico and Arizona Rules of Evidence provide the same.  *See* N.M. R. EVID. 11-609(a) (2008); ARIZ. R. EVID. 609(a) (1988).  Petitioner's misdemeanor convictions do not involve dishonesty or false statement and, thus, would not be permitted as impeachment were he to testify in the future.  Accordingly, I find that this ground does not constitute a collateral consequence sufficient to establish that the Petiton involves a "live controversy."

Petitioner's final argument that he will suffer collateral consequences from his tribal convictions is that his convictions could be used to increase his sentence in a future sentencing proceeding.  *Doc. 26* at 10.  Prior to *Spencer*, Supreme Court holdings substantiated Petitioner's position.  *See e.g., Benton v. Maryland*, 395 U.S. 784, 790-791 (1969); *Pennsylvania v. Mimms*, 434 U.S. 106, 108, n.3 (1977) (per curiam).  In *Spencer*, however, the same proffered collateral consequence was rejected by the Supreme Court because the possibility of a sentence enhancement was something that "was contingent upon [the defendants'] violating the law, being caught and convicted," and the defendants

---

[31]        Moreover, to impeach a criminal defendant with even felony convictions, the court must also "determine[ ] that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." FED. R. EVID. 609(a) (2011).

themselves were "able - and indeed required by law - to prevent such a possibility from occurring.'" 523 U.S. at 15 (quoting *Lane*, 455 U.S. at 632, n.13); *see also O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("[W]e are . . . unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws.  We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction.").  Following the *Spencer* decision, the Tenth Circuit also "recognized that under *Spencer*[,] collateral consequences cannot be based on the speculation that an individual will receive an enhanced sentence in future sentencing proceedings in connection with a crime he has not yet committed." *Hernandez-Baide*, 146 F. App'x at 304 *(*citing *Meyers*, 200 F.3d at 718; *Spencer*, 523 U.S. at 13-15); *see also United States v. Kissinger*, 309 F.3d 179, 182 (3d Cir. 2002).

None of Petitioner's five assertions meet his burden of establishing that sufficient collateral consequences flow from his misdemeanor tribal sentences. *See Meyers,* 200 F.3d at 718.  As a result, I recommend his Petition be dismissed as moot.

VI.   CONCLUSION

"[A]bsent exceptional circumstances, federal courts typically 'should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted.'" *Stidham*, 640 F.3d at 1149 (citations omitted). Petitioner's case does not fall within any exceptional circumstance excusing his failure to

exhaust tribal remedies.  Consequently, I maintain the recommendation that his Petition be dismissed for failure to exhaust.

Even if the Court were to excuse the exhaustion failure, Petitioner has been released from custody since the filing of his habeas action.  This fact moots his Petition against Respondent Silversmith, Petitioner's custodian when he was in custody, since he no longer has the power "to give the petitioner what he seeks" if the instant Petition were found to have merit.  *See Poodry*, 85 F.3d at 899.  Petitioner's release has also mooted his claims against Respondent Hecht on several alternative theories.

First, the Petition lacks any meritorious claims outside of the claim that his sentence exceeded the statutory maximum that the tribe could impose.  Therefore, the appropriate remedy would be a vacatur of any sentence in excess of one-year.  Given this limitation on the available remedy, granting the Petition would still leave Petitioner with a conviction with a one-year sentence.  This relief would have no real impact because (1) Petitioner has already been released, and (2) none of the collateral consequences claimed by Petitioner would be removed. *See Quezada-Enriquez*, 567 F.3d at 1231 ("Once it becomes impossible for a court to grant effectual relief, a live controversy does not exist, and a case is moot.") (citation omitted).

Second, even if the Court found merit in all of the claims in the Petition, vacatur of the sentence would be the extent of the available remedy.  The only claim in the Petition which arguably undermines the convictions themselves (as opposed to only the sentence)

is the claim that Petitioner was denied his right to counsel before he pled guilty and received imprisonment.  However, as seen in *Jackson*, the remedy for such a violation is not vacatur of the conviction.  Instead, it too is limited to vacatur of the sentence.  Given this limitation on the available remedy, granting the Petition would still leave Petitioner with a conviction.  Again, this relief would have no real impact because (1) Petitioner has already been released, and (2) none of the collateral consequences claimed by Petitioner would be removed.

Finally, even assuming that Petitioner could be granted the full relief he seeks on all his claims, it would be the vacatur of four misdemeanor convictions.  Given that he has been released from custody on these convictions, he bears the burden of demonstrating sufficient collateral consequences to meet Article III's "case or controversy" requirement.  The collateral consequences to which he points are insufficient to do so.

Each of these explanations independently lead to the same conclusion – that the instant Petition has become moot due to Petitioner's release from custody.  Consequently, in addition to the failure of exhaustion, I recommend dismissal of the Petition as moot.

IT IS SO RECOMMENDED.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.

_____

UNITED STATES MAGISTRATE JUDGE